UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                                          Case No. 8:06-bk-01702-MGW
                                                                Chapter 11
Digital Community Networks, Inc.,

    Debtor.
_____/

# MEMORANDUM OPINION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

       The Debtor and SW Florida Communications, LLC have sued Bay Village of Sarasota in state court under a cable services contract. Bay Village says it is excused from performance under that contract because it was previously rejected in this bankruptcy case. The state court has refused to decide that issue because it says the question of whether the cable service contract is property of the estate is exclusively the province of this Court. This Court must now decide whether the cable services contract was rejected in this bankruptcy case.

       The Court concludes that it was not. The Debtor could not have assumed or rejected that contract since the Debtor did not own it as of the petition date. Three years before filing this case, the Debtor had assigned the cable service contract to a limited liability company it created, and that limited liability company, in turn, sold the contract (along with the rest of its assets) to an investor. While it is true the Debtor listed the contract in its schedules and otherwise took the position it owned the contract, the Debtor is not judicially estopped from now taking a contrary position in state court because its previous claim of ownership was in an effort to recharacterize the sale of that contract as a disguised loan and was not intended to make a mockery of the judicial system. Accordingly, for the reasons discussed below, the cable services contract was not part of the bankruptcy estate and was never rejected during this bankruptcy case.

## Background

The Debtor is a cable service provider.[1] It typically provided cable services to multi-unit locations, such as apartment complexes and condominium associations.[2] The Debtor financed its operations by creating a separate limited liability company for each location, assigning the cable service contract for that location to the limited liability company, and then selling a 99% or 100% interest in the limited liability company to investors.[3] The Debtor would then retain the right to repurchase the 99% or 100% interest in the limited liability company for a specified amount.[4] Bay Village is a 300-plus unit life-care facility located in Sarasota, Florida.[5]

<u>The Debtor contracts to provide cable services to Bay Village</u>

In December 2000, the Debtor and Bay Village entered into two contracts.[6] The first contract was a Contract for Bulk Cable Service.[7] Under the cable service contract, the Debtor agreed to provide cable services to Bay Village, and Bay Village agreed to pay the Debtor $9.15 per month for each unit for those services.[8] The second contract was an Exclusive Right to Provide Cable Service.[9] That agreement, sometimes referred to as the cable easement, gave the Debtor an easement to install its cable equipment and the exclusive right to provide cable

---

[1] Doc. No. 407 at ¶ 3.

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] Doc. No. 411-1 at ¶ 4.

[6] *Id.* at ¶¶ 5 & 6.

[7] Doc. No. 403-4.

[8] *Id.* at ¶¶ 1 & 2.

[9] Doc. No. 403-5.

services to Bay Village.[10] Under both agreements, then, the Debtor had the exclusive right to provide cable service to Bay Village for 15 years.

Woolf Cable Television Service acquires BVC

Consistent with its typical financing arrangement, the Debtor created Bay Village Cable, LLC ("BVC") and assigned the cable service contract and the cable easement to BVC in January 2003.[11] It is unclear whether the Debtor immediately sold its interest in BVC to an investor at that time. It appears that the Debtor originally had an investor for BVC in 2003 but later needed a replacement investor.[12] What is clear, however, is that in June 2005, BVC entered into a contract to sell its cable television service business with respect to Bay Village to Woolf Cable Television Service, LLC ("Woolf").[13]

According to the sale agreement between BVC and Woolf, BVC agreed to sell its equipment, licenses, inventory, and the other assets it used in its cable services business to Woolf for $175,000.[14] The sale agreement included an exhibit identifying the assets that Woolf was purchasing.[15] One of the assets identified was the right to provide cable services to Bay Village:

> All rights, now and in the future of [the Debtor] to provide cable television services to [Bay Village] . . . including, but not limited to services rendered under an agreement by and between [the Debtor] and [Bay Village] dated December 22, 2000, which was assigned to [BVC] pursuant to an Assignment of Cable Easement from [the Debtor] dated January 15, 2003.[16]

---

[10] *Id.* at 2.

[11] Doc. No. 407 at ¶¶ 5 & 6; Doc. Nos. 403-6 & 403-7.

[12] *Id.* at ¶ 7.

[13] Doc. No. 403-8.

[14] *Id.* at ¶ 1.

[15] *Id.* at Ex. 1.

[16] *Id.* at Ex. 1, ¶ 1.

As part of the sale transaction, Woolf and BVC also entered into a repurchase agreement.[17] Under the terms of that agreement, the Debtor had the right to purchase all of Woolf's membership interests.[18] The purchase price was set at $234,467.[19] And the purchase option could be exercised four years after Woolf acquired BVC. In the meantime, the Debtor agreed to provide management services to Woolf in connection with the cable service contract.[20]

The Debtor proposes to obtain the
<u>cable service contracts in bankruptcy</u>

Ten months after BVC sold its assets to Woolf, the Debtor filed for bankruptcy. It appears from the Court's review of the record in this case that the Debtor had developed its game plan from the outset: the Debtor was going to reacquire the limited liability companies holding the cable service contracts (including BVC) either by exercising the repurchase options or by recharacterizing the sales of those limited liability companies as disguised loans rather than true sales.

Consistent with this game plan, the Debtor initially claimed the right to obtain ownership of the cable service contracts in its schedules. In particular, the Debtor listed the easement agreement with Bay Village (and thirty-one other communities) on schedule A.[21] On schedule B, the Debtor identified its interests in fourteen limited liability companies—although for some reason it failed to include BVC.[22] The Debtor also listed the executory contracts identified on

---

[17] Doc. No. 403-13.

[18] *Id.* at ¶ 2.

[19] *Id.* at ¶ 2(d).

[20] Doc. No. 403-12.

[21] Doc. No. 27-1.

[22] Doc. No. 27-2 at 2.

4

schedule G in response to the question asking the Debtor to identify any other personal property not listed on schedule B.[23] And the executory contracts listed on schedule G included the cable service contract with Bay Village, as well as the management and repurchase agreements with Woolf.[24] All of that was consistent with the Debtor's statement in its case management summary that the "bulk" of the Debtor's assets included repurchase options with the various limited liability companies and numerous management contracts for cable facilities.[25]

Next, the Debtor outlined its plan to exercise its rights to obtain ownership of those valuable cable service contracts in one of two ways. In its initial disclosure statement, the Debtor explained that it intended on borrowing $4 million to exercise its rights under the various repurchase agreements to reacquire the limited liability companies.[26] If that failed, then the Debtor intended on filing adversary proceedings against the investors to have the various sale agreements recharacterized as disguised loans.[27] In either case, the Debtor intended on assuming the cable service contracts once it obtained ownership of them. And consistent with this, the Debtor's initial plan provided that all of its cable service contracts would be assumed as executory contracts of the Debtor including the cable service contract with Bay Village.[28]

Consistent with its proposed plan and disclosure statement, the Debtor filed a motion to assume over 30 cable service contracts.[29] The cable service contract with Bay Village was one of

---

[23] *Id.* at 5.

[24] Doc. No. 27-7.

[25] Doc. No. 13 at ¶ 7.

[26] Doc. No. 120 at 2.

[27] *Id.*

[28] Doc. No. 121, ¶ 8.5 at 16; 121-2 at 2.

[29] Doc. No. 178.

the contracts listed in the Debtor's motion to assume.[30] Ultimately, the Court never heard the Debtor's motion to assume because the Debtor was unable to confirm its initial plan.

The Debtor relinquishes its right to claim
<u>ownership of the cable service contracts</u>

As a consequence, the Debtor filed thirteen adversary proceedings seeking to recharacterize the "sale" of the cable service (and related) contracts to the investors as disguised financing transactions.[31] The Debtor was ultimately able to settle those adversary proceedings on the following terms: (i) a new master limited liability company to be created and owned by the investors would pay the Debtor $220,000; (ii) one particular investor (David Beall) would pay $20,000 for all of the Debtor's stock; and (iii) the Debtor would sign an agreement to provide management services to the new master limited liability company.[32] The settlement agreement, which obviously contemplated that the cable service contracts would ultimately be assigned to the new master limited liability company, was approved by the Court.[33]

The Debtor then filed an amended plan that incorporated the terms of the approved compromise.[34] Under the amended plan, the Debtor agreed to pay its creditors from a plan fund consisting of $480,000.[35] Of that amount, $240,000 came from the sale of the Debtor's operations in Homestead, Florida. The remaining $240,000 came from the proceeds of the

---

[30] *Id.* at Ex. A.

[31] 8:06-ap-00424-MGW; 8:06-ap-00521-MGW; 8:06-ap-00522-MGW; 8:06-ap-00523-MGW; 8:06-ap-00524-MGW; 8:06-ap-00525-MGW; 8:06-ap-00533-MGW; 8:06-ap-00534-MGW; 8:06-ap-00535-MGW; 8:06-ap-00536-MGW; 8:06-ap-00537-MGW; 8:06-ap-00538-MGW; 8:06-ap-00539-MGW.

[32] Doc. No. 261 at ¶ 8; Doc. No. 274.

[33] Doc. Nos. 269 & 312.

[34] Doc. Nos. 287 & 288.

[35] Doc. No. 287 at 2; Doc. No. 288 at ¶ 8.1.

settlement with the investors.[36] The amended plan contemplated that the Debtor would continue to operate only to provide management services to the new limited liability company created as part of the settlement.[37] And the provision dealing with the assumption of the cable service contracts was deleted as the Debtor had settled its litigation with the investors under which it was seeking to recharacterize those contracts as disguised loans. Thus the amended plan did not deal in any way with the cable service contracts. The Court confirmed the Debtor's amended plan on May 8, 2007.[38]

<u>SW Florida Communications sues Bay Village under the cable services contract</u>

What happened after confirmation is somewhat unclear, but there does not seem to be any dispute that SW Florida Communications was the entity created to be the master limited liability company under the settlement agreement between the Debtor and investors.[39] Nor does there appear to be any dispute that the various cable service contracts (or whatever rights existed under them) were assigned to SW Florida Communications. It is also undisputed that SW Florida Communications, along with the Debtor, then sued Bay Village for breach of the cable service contract.[40]

Bay Village disputed the enforceability of the cable service agreement in state court. One, or perhaps both, of the parties moved for summary judgment on the contract claim. The state court ruled that it lacked jurisdiction over the state court contract claim because the state court concluded that the cable service contract was effectively property of the estate, and bankruptcy

---

[36] Doc. No. 287 at 2.

[37] Doc. No. 287 at 2; Doc. No. 288 at ¶ 8.1.

[38] Doc. No. 365.

[39] Doc. No. 410-6, p. 6, l. 25 – p. 7, l.8; p. 8, ll. 16-20; p. 9, ll. 5-25; p. 10, l. 10 – p. 15, l. 3; p. 32, l. 32 – p. 37, l. 14.

[40] Doc. Nos. 403-1 & 403-2.

courts have exclusive jurisdiction over all property of the estate.[41] The state court then stayed SW Florida Communications' contract claims until this Court gave it specific authority to proceed with the matters pending in the state court case.[42]

Bay Village says it is excused from performance
<u>because the cable services contract was rejected in bankruptcy</u>

So Bay Village asked this Court to reopen the Debtor's bankruptcy case and declare that the cable service contract (i) constitutes property of the bankruptcy estate; and (ii) was rejected in this bankruptcy case.[43] Bay Village's argument that the cable service contract was rejected in this bankruptcy case is simple and straightforward.[44] According to Bay Village, the Debtor's confirmed plan provides that any executory contracts that are not expressly assumed are deemed rejected. The Debtor in this case moved to assume the Bay Village cable service contract. But the Court never ruled on that motion. So Bay Village argues that the motion to assume the cable service contract was never ruled on, and as a consequence, it is deemed rejected. There is an equally simple and straightforward reason why that argument is flawed.

## Conclusions of Law

The cable services contract was not the Debtor's to reject. That is because the cable services contract was not property of the estate. For starters, the Debtor assigned the cable services contract, along with the cable easement, to BVC over three years before the petition date. Bay Village does not dispute that fact, nor it does provide any authority for the proposition that assets owned by the Debtor's wholly owned subsidiary are property of the estate. But in any

---

[41] Doc. No. 403-3.

[42] *Id.*

[43] Doc. No. 390; Doc. No. 398 at ¶ 13; Doc. No. 411 at 15.

[44] Doc. No. 411 at 1 & 8-9.

event, BVC sold all of its assets to Woolf prepetition. So the property was not even owned by BVC. Nevertheless, Bay Village claims the cable services contract was property of the estate because (i) it was not specifically listed in the bill of sale to Woolf; and (ii) the Debtor listed the cable services contract in its schedules.[45]

There are two problems with that argument. First, while it is true that the bill of sale did not mention the cable services contract by name, it did not have to. The bill of sale specifically provides that BVC transferred *all of the Debtor's rights (now and in the future) to provide cable services to Bay Village*.[46] Plus, the specific reference to the cable easement that Bay Village relies on is preceded by the phrase "including, but not limited to," indicating that the list of assets identified was not intended to be exhaustive.[47] Besides, what good would it do Woolf to buy the exclusive right to provide cable services but not the contract that actually allows them to do that? Second, it does not matter whether the Debtor claimed it still owned the cable services contract. As the Supreme Court explained in *Butner v. United States*, "[p]roperty interests are created and defined by state law," so "[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."[48] And there is no question that the cable services contract was conveyed to Woolf under Florida law. No reasonable person viewing the transaction could conclude otherwise. Accordingly, the cable services contract was never property of the estate and could not be assumed or rejected in this bankruptcy case.

---

[45] Doc. No. 411 at 4, 5 & 13-14.

[46] Doc. No. 403-9, Ex. A, ¶ 1.

[47] *Id.*

[48] 440 U.S. 48, 55 (1979).

Bay Village's better argument—albeit somewhat related—is that the Debtor is estopped from claiming the cable services contract was not property of the estate. According to Bay Village, the Debtor has taken two totally contradictory positions. On the one hand, the Debtor claimed in its schedules—and throughout this bankruptcy case when it suited the Debtor's interests —that it owned the cable services contract. On the other hand, the Debtor now claims in state court that the cable services contract was not part of the bankruptcy estate because it was really owned by Woolf. Bay Village claims the doctrine of judicial estoppel precludes the Debtor (or SW Florida Communications) from taking a position in state court that is different from the one taken in this bankruptcy case.

Bay Village is correct that the doctrine of judicial estoppel generally precludes a party from "asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."[49] Judicial estoppel is a frequently invoked doctrine. It appears there are close to 300 reported decisions of courts in the Eleventh Circuit that involve the doctrine of judicial estoppel. Most of the cases fall into one particular fact pattern: a debtor files for bankruptcy but fails to disclose (intentionally or unintentionally) an existing or potential claim, only to pursue that claim after the bankruptcy case has been closed.[50] The question in those cases is whether the debtor should be permitted to proceed on his or her claim when the debtor has represented in his or her schedules that no such claim existed.[51]

---

[49] *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002).

[50] *See, e.g., Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1272-73 (11th Cir. 2010); *Ajaka v. Brooksamerica Mtg. Corp.*, 453 F.3d 1339, 1342-43 (11th Cir. 2006); *Parker v. Wendy's Int'l, Inc.*, 365 F.3d 1268, 1269-71 (11th Cir. 2004); *Barger v. City of Cartersville, GA*, 348 F.3d 1289, 1290-92 (11th Cir. 2003); *De Leon v. Comcar Indus., Inc.*, 321 F.3d 1289, 1290-91 (11th Cir. 2003).

[51] *See, e.g., Robinson*, 595 F.3d at 1273-76; *Ajaka*, 453 F.3d at 1344-46; *Parker*, 365 F.3d at 1271 *Barger*, 348 F.3d at 1293-96; *De Leon*, 321 F.3d at 1291-92.

This case does not fall into the familiar fact pattern where the debtor fails to disclose an asset (i.e., a claim). If anything, the opposite happened here. The Debtor disclosed an asset that it did not actually own—albeit as part of its game plan to acquire the cable service contracts so that it could formulate and effectuate its plan of reorganization. Of course, the fact that this case does not fall within the usual fact pattern does not mean that judicial estoppel could not apply. But this is not the type of situation that judicial estoppel was designed to prevent.

As the Supreme Court recognized in *New Hampshire v. Maine*, the purpose of judicial estoppel "is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."[52] While acknowledging that the circumstances under which judicial estoppel "are not reducible to any general formulation," the Supreme Court did observe that courts have generally considered whether (i) the present position is clearly inconsistent with the earlier position; (ii) the party succeeded in persuading a court to accept the earlier position, so that judicial acceptance of the inconsistent position in a later proceeding would create the perception that either the first or second court was misled and; (iii) the party advancing the inconsistent position would derive an unfair advantage.[53] The Eleventh Circuit, consistent with the factors identified by the Supreme Court, has developed its own two-factor test for when judicial estoppel applies:

> First, it must be shown that the allegedly inconsistent positions were made under oath in a prior proceeding. Second, such inconsistencies must be shown to have been calculated to make a mockery of the judicial system.[54]

---

[52] 532 U.S. 742, 749-50 (2001).

[53] *Id.* at 750.

[54] *Burnes*, 291 F.3d at 1285.

Even if the Debtor took inconsistent positions, there is no record evidence the inconsistencies were calculated to make a mockery of the judicial system. In actuality, the opposite is true. The whole point of the Debtor claiming it owned the cable service contracts was so that it could seek to recharacterize the sales of those contracts to the investors as disguised financing transactions in the event the investors refused to accept the Debtor's proposed plan. It is not at all uncommon for trustees, debtors-in-possession, or creditors to use bankruptcy to recharacterize various transactions. Bankruptcy courts routinely deal with those issues. In fact, this Court alone has two relatively recent reported decisions in which it recharacterized different types of transactions.[55] So there is nothing improper about attempting to recharacterize a transaction in bankruptcy.

And once the Debtor decided it would attempt to recharacterize the sales as loans, it had no choice but to list the cable service contracts on its schedules. Had it not done so, the investors would have responded to any adversary complaint seeking to recharacterize the sales as loans by pointing to the Debtor's schedules as proof that the Debtor did not, in fact, own the cable service contracts. Notably, the Debtor was completely up front with the Court and the creditors about its strategy in this bankruptcy case. Accordingly, the undisputed facts do not support a finding that that the Debtor's initial position in its chapter 11 case that it owned the cable service contracts was calculated to make a mockery of the judicial system. As a consequence, judicial estoppel does not apply here under the Eleventh Circuit's two-part test enunciated in *Burnes v. Pemco Aeroplex, Inc.*[56]

---

[55] *In re Steffen*, 464 B.R. 450, 460-62 (Bankr. M.D. Fla. 2012) (recharacterizing debtor as owner of real property even though that property had been sold twice as part of two court-approved bankruptcy sales); *In re Grubbs Constr. Co.*, 319 B.R. 698, 720 (Bankr. M.D. Fla. 2005) (recharacterizing leases as security agreements).

[56] 291 F.3d at 1285.

It is worth noting that the invocation of the doctrine of judicial estoppel would also not be warranted under the three factors enunciated in *New Hampshire* either.[57] For starters, it is not clear that the positions taken by the Debtor in this case and the state court case are "clearly inconsistent"; the positions are more analogous to pleading in the alternative. Putting that aside, the Debtor never persuaded this Court that it owned the cable service contracts. This Court did not have to decide that issue in light of the compromise between the Debtor and the investors. In any event, there is no danger that the state court's acceptance of the Debtor's claim that the cable service contracts were not part of the bankruptcy estate would create the perception that this Court was somehow misled by its earlier position. As discussed above, the Debtor was up front about its strategy in this case, and that strategy is one that is fairly unremarkable in bankruptcy cases. Finally, there is no evidence—indeed, Bay Village has not offered any argument—that the Debtor has somehow gained an unfair advantage by taking the "inconsistent positions."

## Conclusion

Bay Village is correct that the confirmation order in this case provides that any executory contracts not specifically assumed are deemed rejected. It is also true that the Debtor never assumed its cable service contract and cable easement with Bay Village. But that is because the Debtor did not own those contracts. They were not part of the bankruptcy estate. And the Debtor is not estopped from claiming otherwise. Accordingly, the Court will enter a separate order (i) granting the Debtor's motion for summary judgment; (ii) denying Bay Village's summary

---

[57] 532 U.S. at 750.

judgment motion; and (iii) authorizing the state court to proceed with the pending state court action between the parties since the cable services contract was not part of the bankruptcy estate.

**DATED** in Chambers at Tampa, Florida, on    August 27, 2013   .

*/s/ M.G. Williamson*

Michael G. Williamson
United States Bankruptcy Judge

**James D. Gibson, Esq.**
**Gibson Kohl Wolff & Hric, P.L.**
*Counsel for Debtor*

**M. Lewis Hall, III, Esq.**
**Williams Parker Harrison Dietz & Getzen**
*Counsel for Bay Village of Sarasota, Inc.*

Service Instructions: James D. Gibson is directed to serve a copy of this memorandum opinion on interested parties and file a proof of service within 3 days of entry of the opinion.